UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:21-cr-00251-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| MARCO ANTONIO OSUNA, | |
| Defendant. | |

## INTRODUCTION

Before the Court is Defendant Marco Antonio Osuna's Motion to Suppress (Dkt. 44). After police officers discovered blue pills in a small black container found in a backpack in Osuna's car, Osuna was indicted for conspiracy to distribute and possession with intent to distribute 400 grams or more of fentanyl. Osuna alleges that the search of his car was conducted incident to an unlawful seizure in violation of the Fourth Amendment, and therefore the fruits of that search, including the alleged fentanyl discovered in the car must be suppressed. The Court held an evidentiary hearing on the Motion on November 17, 2022, and now issues the following decision.

# BACKGROUND

On August 7, 2021, at approximately 6:54 p.m., officers of the Pocatello Police Department were dispatched to conduct a welfare check at the Common Cents gas station. Dispatch had received a call from an individual concerned about a male in a black Nissan Altima with Arizona plates parked at the gas station. The call was recorded. The caller reported that "there's a man that's been parked in the Common Cents parking lot….And, uh, his car is like smashed up kind of, uh, we think he's passed out drunk." *Dispatch Call Tr.*, p. 1, Dkt. 48-1. The caller further explained that the man in the Nissan had been there "for like two hours," and the caller "was afraid if he was, like, OD'd or something." *Id.* Dispatch relayed to the responding officers that there was "a male slumped over the steering wheel for the last two hours" at the Common Cents parking lot, in a black Nissan Altima with Arizona plates with "some damage to the vehicle." *Id.*

The responding officers, Officer T. Namohala and Officer M. Saldana arrived at Common Cents at approximately 7:00 p.m. Officer Namohala arrived first on his patrol motorcycle and, without activating his sirens or lights, parked the motorcycle by the gas pumps approximately 20 or 30 feet away from the black Nissan Altima. Officer Saldana arrived soon after and pulled up next to Officer Namohala's motorcycle in her patrol car. Officer Namohala testified that the information relayed by dispatch regarding a male slumped over the steering wheel

for two hours in a damaged vehicle raised concerns not only regarding the man's welfare but also whether the man had been driving while impaired. *Hearing Tr.* 26: 8-16. Officer Namohala further testified on cross-examination that frequent DUI-related arrests occur in the area – even in the daylight hours. *Hearing Tr.* 38:1-22.

As the officers arrived, they observed a vehicle matching the description given by the caller – a Black Nissan with a damaged window and Arizona plates – parked askew in front of the store. A male, the sole occupant, was sitting in the driver's seat. The man was later identified as the defendant, Marco Antonio Osuna. The vehicle was turned on and the engine was running. Although the windows had a very dark tint, the officers could see the man speaking on his cell phone as they walked towards the vehicle.

Officer Namohala approached the driver's side of the vehicle and waved at Osuna. Officer Saldana followed behind Officer Namohala a short distance. Both officers were uniformed, and their firearms were in plain view of Osuna, but remained holstered throughout the entire encounter. In response to Officer Namohala's wave, Osuna cracked his window approximately two to three inches. Officer Namohala said hello and asked Osuna if he was okay. Osuna responded that he was fine. He then pointed out the damage to the front of his car and explained his check engine light came on, so he pulled into the Common Cents parking lot to wait for a friend to come pick him up.

MEMORANDUM DECISION AND ORDER - 3

Officer Namohala told Osuna that they were responding to a call saying Osuna had been parked there for over two hours and had been slumped over the steering wheel. Osuna seemed to confirm that he had been parked there two hours but scoffed at the suggestion that he was slumped over the wheel. Namohala also inquired about the damage to Osuna's car and asked if Osuna had hit anything. Osuna denied that he had hit anything and said his car had been damaged "for a while" – a "couple of days."

Officer Namohala testified that he observed Osuna's eyes were red and glassy and that Osuna's explanation regarding the damage to his car "wasn't really making sense." *Hearing Tr.*, p. 29:6-21. Namohala further testified that he had trouble understanding Osuna, so, to him, "his speech appeared to be slurred." *Id.* Namohala then asked to see Osuna's driver's license. Osuna replied that he would look for it; he then proceeded to roll his window back up and lock the doors. The officers observed Osuna reaching around his vehicle. Officer Saldana commented that Osuna's movements were "super slow" and that he kept running into things and did not what he was looking for. Officer Namohala replied, "Yeah, his eyes were bad." Officer Saldana noted that there was "something in the front seat," but she could not see it because the window tint was too dark; she then observed that Osuna was reaching for something in the back seat. According to Officer

Namohala, Osuna's movements appeared slow and confused as he was purportedly looking for his driver's license. *Hearing Tr.* 30:20-31:1.

Officer Namohala then knocked on the car window and asked Osuna to exit the vehicle. Osuna asked why, and Officer Namohala explained that he had reason to suspect Osuna was impaired and needed to perform a Field Sobriety Test. Osuna replied he was going to lock his stuff up and rolled up the window. After Osuna rolled up the window, Officer Namohala asked Osuna to exit the vehicle multiple times.  Osuna said he would exit, but he did not get out of the vehicle. When Namohala initiated the contact with Osuna, he spoke cordially and without any threat of force, but his tone became increasingly forceful and agitated after Osuna rolled the window back up and did not immediately get out of the car.

After about ten seconds, Osuna unlocked the vehicle but did not open the door. Officer Namohala opened the door and told Osuna to exit the vehicle. Osuna stood up and exited the vehicle. As Osuna stood up from his vehicle, an empty pen case dropped from his lap – an item known as a "tooter" and commonly used to ingest drugs. Officer Namohala immediately told Osuna that he was under arrest. Osuna asked why he was being arrested and jumped backward into the seat of the vehicle. Officer Namohala pulled his taser from his holster and pointed it at Osuna and yelled at him to get out of the car or he would be tased. Officer Namohala then tased Osuna.  Osuna continued to struggle after being tased. Other officers arrived

on scene to assist. Eventually, Osuna was subdued and transported to a local hospital for treatment and evaluation.

Officers conducted a search of Osuna's vehicle to locate his identification and drug items related to the pen cap that was observed falling from his lap. They located the following items: a bag containing a substance consistent with methamphetamine in the center console, a loaded handgun in the passenger seat floorboard, an AR-style rifle on the passenger-side floorboard, and a large number of blue pills believed to contain fentanyl located in a canister in a backpack found on the passenger seat floorboard. Osuna now seeks to suppress the fentanyl pills that were found during the search of his vehicle after his arrest, arguing that the was unlawfully seized in violation of the Fourth Amendment.

## ANALYSIS

### 1. Seizure

The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: (1) arrest, which must be supported by probable cause, *see Adams v. Williams*, 407 U.S. 143, 148–49 (1972); (2) brief investigatory stops, commonly known as *Terry* stops, which must be supported by reasonable articulable suspicion, *see Terry v.*

*Ohio*, 392 U.S. 1, 20–22 (1968); and (3) brief encounters between police and citizens, which require no objective justification, *see Florida v. Bostick*, 501 U.S. 429, 434 (1991).

In this case, neither party disputes that the encounter between the officers and Osuna began as a lawful "welfare check" that ripened into a full-blown arrest, requiring probable cause. Osuna, however, contends that the officers unlawfully seized him prior to the arrest when Officer Namohala asked to see his driver's license absent reasonable suspicion. The Court disagrees.

"A person is seized if taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007) (quoting *Bostick*, 501 U.S. at 437 (1991) (internal quotation marks omitted); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (holding that an encounter is a seizure if "a reasonable person would have believed that he was not free to leave"). This "'reasonable person' test presupposes an innocent person." *Bostick*, 501 U.S. at 438. "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that

compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 54

Not every encounter between a law enforcement official and a citizen involves a seizure, however. *Terry*, 392 U.S. at 19 n. 16. "Absent indicia of force or aggression, a request for identification or information is not a seizure or investigatory stop." *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) (citing *$25,000 U.S. Currency*, 853 F.2d 1501, 1505 (9th Cir. 1988)); *INS v. Delgado*, 466 U.S. 210, 216 (1984) (brackets and internal quotation marks omitted). Law enforcement officers may approach citizens, put questions to them, and ask for identification without implicating the Fourth Amendment "as long as the police do not convey a message that compliance with their request is required." *Bostick*, 501 U.S. at 434; *see also Delgado*, 466 U.S. at 216. "This is true whether an officer approaches a person who is on foot or a person who is in a car parked in a public place." *Washington*, 490 F.3d at 770 (citing *Kim*, 25 F.3d at 1430).

As noted, no one disputes that the encounter between the officers and Osuna was initially consensual. The officers approached Osuna to check on his welfare in response to the caller who reported Osuna had been parked in the gas station parking lot for two hours and appeared to be "passed out drunk" or "OD'd or something." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (A community caretaking function is one "totally divorced from the detection, investigation, or

acquisition of evidence relating to the violation of a criminal statute."). The encounter occurred in a public parking lot in full daylight. *See United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021) (relying on the fact that the encounter occurred during the day and in a public place). The officers did not activate their patrol vehicle lights or siren as they approached, and they parked away from Osuna's vehicle in a way that would not prevent Osuna from driving away. *See United States v. Summers*, 268 F.3d 683, 687 (9th Cir. 2001) (finding that no seizure occurred although the officer's patrol vehicle "partially blocked" the defendant's parked car). Although the officers were uniformed, with their firearms visible, neither officer touched their weapons before Namohala asked to see Osuna's license. *See United States v. Drayton*, 536 U.S. 194, 205 (2002) (stating that "[t]he presence of a holstered firearm ... is unlikely to contribute to the coerciveness of [an] encounter absent active brandishing of the weapon). Finally, Officer Namohala spoke in courteous and cordial tone when he initially greeted and questioned Osuna – including when he asked to see Osuna's identification. *See id.* at 204 (noting that officers did not use "an authoritative tone of voice").

Officer Namohala did not advise Osuna that he could refuse the request for identification. This factor supports finding a seizure. *Orhorhaghe v. I.N.S.*, 38 F.3d 488, 496 (9th Cir. 1994) (finding that the officers' failure to "advise [the defendant] that he was free to decline their instructions and to terminate the

encounter" supported finding a seizure). It is not enough by itself, however. As the Supreme Court has explained, the fact that most people "will respond to a police request ... without being told they are free not to respond[ ] hardly eliminates the consensual nature of the response." *Delgado*, 466 U.S. at 216.

Notably, in *Washington*, the Ninth Circuit found a consensual encounter in similar (but arguably more coercive) circumstances. In that case, at approximately midnight, an officer approached a man in a parked vehicle, shone a flashlight into the vehicle, and asked for permission to search the man's person, and the man agreed. *Washington*, 490 F.3d at 767–68. In finding that this was a consensual encounter, the court explained:

> We conclude that although [officer] Shaw conceded he suspected Washington of no criminal activity, Shaw's initial encounter with Washington was not a seizure and did not implicate the Fourth Amendment. In approaching the scene, Shaw parked his squad car a full car length behind Washington's car, so he did not block it. Shaw did not activate his sirens or lights. Shaw approached Washington's car on foot, and did not brandish his flashlight as a weapon, but rather used it to illuminate the interior of Washington's car. Although Shaw was uniformed, with his baton and firearm visible, Shaw did not touch either weapon during his encounter with Washington. Shaw's initial questioning of Washington was brief and consensual, and the district court found that Shaw was cordial and courteous. Under these circumstances, the district court correctly concluded that a reasonable person would have felt free to terminate the encounter and leave.
>
> In sum, officer Shaw was entitled to question Washington for investigatory purposes, and the mere asking of questions, including asking for permission to search Washington's person, raised no Fourth

> Amendment issue so long as a reasonable person in Washington's situation would have felt free to leave.

*Id.* at 770 (internal citation omitted).

As in *Washington*, the record contains no evidence that Namohala used undue intimidation or coercion prior to or up to the point he requested to see Osuna's license. Namohala's mere request to see Osuna's license therefore did not transform the initially consensual encounter into a "Fourth Amendment event." *Kim*, 25 F.3d at 1430 (holding that no seizure occurred when officers partially blocked a parked car, approached the car on foot, and requested permission to question the car's occupants). Such inquiries are part and parcel of a consensual encounter unless officers "convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 437. This is true even though "police interrogation of automobile occupants typically involves a greater degree of intrusiveness than questioning of pedestrians and thus more readily impinges on the Fourth Amendment." *Kim*, 25 F.3d at 1430 (citing *Mendenhall*, 446 U.S. at 556–57). "However, where, as here, officers come upon an already parked car, this disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense *ab initio*, except of his own volition." *Id.* In this case, Officer Namohala could ask to see Osuna's identification or driver's license, "and doing so did not constitute a seizure." *State v. Couch*, 857, 504 P.3d 388, 393 (Id. Ct. App.

2021) ("The officer could also ask to see Couch's identification or driver's license, and doing so did not constitute a seizure").

Relying on the Idaho Court of Appeals decision in *State v. Osborne*, 7 P.3d 219 (Id. Ct. App. 1991), Osuna insists that "[w]hen Officer Namohala asked the Defendant to produce his driver's license, he was seized in Idaho as a matter of law." *Def's Written Closing Argument*, p. 6, Dkt. 53. In *Osborne*, the court concluded that the defendant was seized when the officer 'took' the defendant's license. *Id.* In addition, the *Osborne* court held "as a matter of law that Osborne could not reasonably have believed he was at liberty to ignore the police presence and go about his business" when the officer asked to see Osborne's driver's license because I.C. § 49-316 required him to comply with the request since he was in the driver's seat of a vehicle with the engine running. *Id.* But – consistent with Supreme Court precedent – the Idaho Supreme Court implicitly overruled the Idaho Court of Appeals decision in *Osborne* when it held that "[i]nterrogating a person concerning his identification or requesting identification does not, without more, constitute a seizure" – even if the individual is seated in the driver's seat of a vehicle. *State v. Nickel*, 7 P.3d 219, 222 (Idaho 2000) (citing *Delgado*, 66 U.S. at 216); *see also Couch*, 857, 504 P.3d at 393, n. 2 ("To the extent *Osborne* conflicts with the Idaho Supreme Court's opinion in *Nickel*, it has been implicitly

overruled."). Thus, *Osborne* no longer mandates a finding that Namohala's request to see Osuna's driver's license constituted a seizure as a matter of law.

Osuna's reliance on the Supreme Court's decision in *Brown v. Texas*, 443 U.S. 47 (1979) is similarly misplaced. Citing *Brown*, Osuna argues that a police officer can never request an individual provide identification absent reasonable suspicion. But, contrary to Osuna's assertion, *Brown* did not create such a blanket rule. In *Brown*, the officers saw two men in a high crime area. They allowed one to leave but stopped the other and ordered him to identify himself and explain his presence, merely because he "looked suspicious" and had not been observed in the area before. Brown clearly could not leave. Brown refused to identify himself and disputed the officers' right to stop him. The officers then frisked Brown and arrested him for violating a Texas statute that prohibited refusal to identify oneself when lawfully stopped and requested to do so. The Supreme Court held "[w]hen the officers *detained* [Brown] for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment." *Brown*, 443 U.S. at 50 (emphasis added).

In *Brown*, it was the fact the officers clearly detained Brown before demanding he identify himself that led the Court to conclude a seizure had occurred, and thus reasonable suspicion was required; it was *not* the mere fact the officers requested to see Brown's identification. In this case, by contrast, Officer

Namohala did not stop or detain Osuna before requesting to see his identification. Osuna was already stopped – and had been so for two hours – when Officer Namohala asked to see his identification. *Brown* is therefore easily distinguished.

### 2. Reasonable Suspicion

Even if Officer Namohala seized Osuna in the constitutional sense when he requested to see his license, Namohala had reasonable suspicion to briefly detain Namohala and conduct a driving under the influence investigation based on the information provided by the caller *and* on his own independent observations of Osuna while conducting a valid welfare check.

The Fourth Amendment permits brief investigatory detentions as long as the officer has "reasonable suspicion supported by articulable facts that criminal activity may be afoot," and the stop is limited in scope. *United State v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry*, 392 U.S. at 30. "The 'reasonable suspicion' necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree of reliability." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330, (1990) (internal quotation marks omitted). "The standard takes into account the totality of the circumstances—the whole picture," such that factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together. *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)); *see also*

*Sokolow*, 490 U.S. at 8–10. "Although 'a mere hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (internal citations and quotation marks omitted); *see also Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

"These principles apply with full force to investigative stops based on information from anonymous tips." *Navarette*, 572 U.S. at 397. In some cases, a citizen's tip may by itself create a reasonable suspicion sufficient to justify a temporary vehicle stop or detention, even if the officer does not personally observe unlawful activity. *Florida v. J.L.*, 529 U.S. 266, 270 (2000). But an anonymous tip alone without "indicia of reliability" is not enough. *Id.*

Here, the information provided by the caller and conveyed by dispatch to the officers of a "male slumped over the steering wheel for the last two hours" in a damaged black Nissan Altima justified, at a minimum, a welfare check on the driver of the vehicle to determine whether he needed medical attention. When the officers arrived, they observed a vehicle matching the description the caller gave – including the damage to the vehicle. The officers further observed that the vehicle was parked askew in the space. Upon Officer Namohala's speaking with Osuna, Osuna immediately pointed out the damage to his vehicle, appeared to acknowledge the caller's assertion that he had been parked there for two hours, and

gave a somewhat confused and inconsistent account of why he was parked there and when the damage to the vehicle had occurred. Officer Namohala immediately noted that Osuna's eyes were "really bad," and the video confirmed Osuna's eyes appeared glassy, suggesting that Osuna may have been impaired.[1]

Officer Namohala's own observations of Osuna, coupled with the information Namohala had received from dispatch, established specific and articulable facts giving rise to a reasonable suspicion that Osuna may be impaired. *See Navarette*, 572 U.S. at 395. And Officer Namohala's observations of the car's motor running with Osuna sitting in the driver's seat gave rise to reasonable suspicion that Osuna may have been in actual physical control of the care. Thus, to the extent Officer Namohala's request to see Osuna's driver license constituted a seizure, the Namohala's corroboration of many of the details provided by the caller, along with the officer's personal observations, justified further investigation, particularly given the minimal intrusion such a request presented. *See Delaware v. Prouse*, 440 U.S. 648, 654, 660 (1979) ("[T]he permissibility of a

---

[1] The Court did not perceive Osuna's eyes as red or bloodshot based on the video footage, but they did appear "glassy." Likewise, the Court did not perceive Osuna's speech as "slurred" but agrees Osuna's explanations were somewhat confused and inconsistent. The fact of Osuna's glassy or watery eyes and his confused and changing story are objective facts upon which Officer Namohala could rely. In addition, the Court notes that body cam footage is not the same as live observations, and there is no reason to doubt the veracity of Officer Namohala's observations regarding Osuna's eyes.

particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."). Officers Namohala and Saldana's subsequent observations of Osuna's slow and confused movements while searching for his driver's license in multiple areas of the vehicle bolstered the officers' reasonable suspicion that Osuna may have been impaired and further justified Officer Namohala's request that Osuna exit the vehicle to perform a field sobriety test.

This case is unlike *Florida v. J.L.*, 529 U.S. 266 (2000), in which Miami-Dade police officers, responding to a purely anonymous call reporting that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," found a male meeting that description and searched him and his two friends, based solely on the tip. *Id.* at 268. In holding the search unconstitutional, the Supreme Court emphasized that "apart from the tip, the officers had no reason to suspect any" of the men they searched of any illegal or suspicious conduct. *Id.* Indeed, the Court distinguished prior case law by highlighting that the stop and frisk in *J.L.* resulted "not from any observations of [the officers] but solely from a call made from an unknown location by an unknown caller." *Id.* at 270. Thus, the Court held that there were insufficient indicia of reliability to support the tip, focusing in particular on the lack of

information that would demonstrate the tipster's credibility or basis of knowledge. *Id.* at 271.

By contrast, in this case, Officer Namohala did not rely solely upon a call made by an unknown person from an unknown location. To the contrary, the caller revealed her location and basis of her knowledge, as the nature and substance of the tip made clear the caller had personally observed the male passed out in a damaged vehicle for two hours at the Common Cents gas station. Critically, Officer Namohala did not rely solely on the information provided by the caller before he seized Osuna. Instead, he confirmed the tip's reliability based upon his own observations upon arriving at the scene, including the damage to the vehicle, and speaking with Osuna, who Officer Namohala perceived as having red and glassy eyes and confused speech.  Unlike in *J.L.*, Officer Namohala suitably corroborated the tip, and it was accompanied by a number of other relevant factors that indicated the potential for criminal activity. The tip, whether "anonymous" or not, carried sufficient indicia of reliability to form part of Officer Namohala's reasonable suspicion.

Reasonable suspicion requires only "some minimal level of objective justification," *Delgado*, 466 U.S. at 217, "based on commonsense judgments and inferences about human behavior," *Wardlow*, 528 U.S. at 125**.** Based on the totality of the circumstances in this case, the Court cannot say under these circumstances

that Officer Namohala was unjustified in seeking to briefly detain Osuna to perform sobriety testing. *See, e.g., United States v. Hernandez*, No. CR-10-121-E-EJL, 2011 WL 447451, at *2 (D. Idaho Feb. 4, 2011) ("During this initial contact with the Defendant, Corporal Barnes noticed suspicious factors which were particularized and objective. Corporal Barnes testified that the Defendant had glassy and bloodshot eyes, was more nervous than the average citizen, and his "story" did not make sense.").

### 3.  Probable Cause

The government also argues Officer Namohala had probable cause to believe defendant was in possession of drug paraphernalia when Osuna dropped a pen case, an item commonly used to ingest illegal drugs, upon exiting his vehicle. Thus, the arrest was justified, according to the government.

A warrantless arrest under the Fourth Amendment requires probable cause to believe a crime has been committed. *Michigan v. Summers*, 452 U.S. 692, 700 (1981). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 4823 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Probable cause requires only a

probability or substantial chance of criminal activity, not the actual showing of that activity." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

In *United States v. Hartz*, 458 F.3d 1011(9th Cir. 2006), the Ninth Circuit held that "the presence of a marijuana pipe in Hartz's pocket, together with undocumented prescription pills, created a 'fair probability' that Hartz's had committed a crime, namely use of drug paraphernalia." *Id.* at 1018. The facts available to Officer Namohala in this case created at least as high a probability as those in *Hartz* that Osuna had committed the crime of using drug paraphernalia. Under Idaho law, it is illegal for any person "to use, or to possess with intent to use, drug paraphernalia to ... ingest, inhale, or otherwise introduce into the human body a controlled substance." I.C. § 37-2734A(1). Furthermore, Officer Namohala testified, based on his training and experience, that a "tooter" or hollow or empty pen case is commonly used to ingest drugs and therefore qualifies as "drug paraphernalia." I.C. § 37-2701(o) (defining drug paraphernalia as "all equipment, products and materials of any kind used, intended for use, or designed for use in…ingesting, inhaling, or otherwise introducing into the human body a controlled substance"). As in *Hartz*, this Court concludes that Officer Namohala had probable cause to arrest Osuna. *Hartz*, 458 F.3d at 1019.

Osuna argues that Officer Namohala did not have probable cause to arrest Osuna for possession of drug paraphernalia because "Officer Namohala had

nothing from which to infer the defendant's intent to use." *Def's Written Closing Argument*, p. 10, Dkt. 53. The Court disagrees. As the government argues, the "tooter" must be considered under the totality of the circumstances, which include: (1) the information provided by the caller that a male was passed out or slumped over in a vehicle for two hours, and the vehicle was damaged; (2) Officer Namohala's observations consistent with the information provided by the caller, including the damage to the vehicle; (3) the vehicle was not parked squarely in the space; (4) Osuna's apparent confirmation that he had been parked there for two hours; (5) Osuna's watery or glassy eyes, slow movements, and confused statements; and (6) the fact the "tooter" fell from Osuna's lap, suggesting it was literally close at hand. From these facts, Officer Namohala could infer that Osuna possessed the tooter "with intent to use" and thus had probable cause to arrest Osuna for violation of Idaho Code § 37-2734A(1).

Because Namohala had probable cause to arrest Osuna, searching inside the vehicle was a constitutionally permissible search incident to arrest. *Hertz*, 458 F.3d at 1019 (citing *United States v. Robinson*, 414 U.S. 218, 226 (1973) and *United States v. Fixen*, 780 F.2d 1434, 1438 (9th Cir. 1986) ("[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.") (internal quotation marks and citation omitted))). The Court

therefore will deny Osuna's motion to suppress any evidence obtained as a result of the search of his car and its contents.

## ORDER

**IT IS ORDERED that** Defendant Marco Antonio Osuna's Motion to Suppress (Dkt. 44) is DENIED.

DATED: December 28, 2022

B. Lynn Winmill
U.S. District Court Judge